Good morning, Counsel. Good morning, Your Honors. May it please the Court, I'm Courtney Johnson here on behalf of the Plaintiffs. Could you pull the microphone up just a little bit? Yes. Is that better? That is better. With me at Counsel table is Christopher Winter. This case involves the first ever permitted open pit chromite sands mine in the United States. Plaintiffs, who are residents of the area where the mining is proposed, are concerned about the potential impacts of toxic hexavalent chromium released as a result of mining activities contaminating their drinking water sources. The National Environmental Policy Act requires that agencies, and in this case the Army Corps of Engineers, to assess whether a project will have significant effects on the environment. And that hard look that's mandated by the National Environmental Policy Act includes the consideration of whether a project has highly uncertain impacts or involves unique or unknown risks. In this case, the Army Corps of Engineers lacked the particular expertise to evaluate the hexavalent chromium risk, and so it turned to the Oregon Department of Environmental Quality for assistance in evaluating that risk. I think we're familiar with the record in this case, at least I am, and I'm sure my colleagues are, too. Let me ask you a question that's sort of unique about this case. The permit was issued, I think, about three years ago? I think that's about right, Your Honor. And there has been monitoring in the meantime? There has been monitoring, that's my understanding. It's not in the record, of course, because of the way this comes up to us and because the preliminary injunction was denied. But I guess I'm concerned about whether or not we should be sending this case back to the agency to do an environmental impact statement from which the information that would be derived is the same information that's been derived over the past several years of monitoring. I take it we know because the permit says that if the levels of CR6 go up, then the permit will be revoked or stopped, that that hasn't happened. Otherwise, you wouldn't be here. And so we have a practical problem here, don't we? Your Honor, I appreciate the question. I think this Court's case law is very clear that an environmental impact statement is mandated where the collection of additional data could resolve uncertainty. My question is, in this case, has the collection of the additional data over the course of the last three years, which is to say monitoring twice a year at the sites, now provided us with the information that an EIS would have provided us with? Well, again, not being in the record. What is in the record was a declaration that was prepared by Dr. Bain, the plaintiff's experts, during the summary judgment proceedings that looked at the initial. Right. And the critical language in that, I think, is when he says, I don't think there's going to be a significant impact here, but I could confirm that through. This can be confirmed through low-cost, simple, effective low-cost tests. What was he referring to? So that's the language that the Department put in the record. That's right, because your expert says, I can't say mining is a terrible idea here, but I think we ought to get more data. Certainly, everybody agreed that monitoring was a good idea here, given the uncertainty. It was your expert's idea. Our expert certainly said monitoring should occur and continue. He also suggested that additional baseline monitoring occur, such as sampling at the wells that people rely on their drinking water. Well, wasn't – and my question was, wasn't that monitoring done in preparation for the permit by ORC? Monitoring of baseline of the domestic wells was not done, to my knowledge, Your Honor. There was baseline monitoring, was there not? There were two groundwater testing events that occurred, one during a wet season and one during a dry season, from seven monitoring wells over the hundreds of acres of areas to be mined. And when the DEQ expert suggested that there ought to be further simple, low-cost, effective tests, what was he referring to? It's not entirely clear. Nor to me. It's clear from the memo that there are certain conditions that are very site-specific that could help hexavalent chromium, if formed, turn back into the trivalent or the inert form. Right, the so-called attenuation. Attenuation, exactly. And those include presence of organic material, iron, manganese, other chemicals in the water that might be there. Those initial monitoring samples showed a wide range, depending on which monitoring well was tested and was reviewed. And so I think we can deduce that those tests to confirm the language in there, to confirm and quantify the attenuation capacity at a particular site, would have allowed further testing at each individual site to look for the levels of organic material at each site, the levels of the other attenuation factors more specifically. With respect, NEPA is a disclosure statute. It wants to be sure that all of the significant issues are out on the table, that the agency and the environmental community and other involved, like the state, bring all of the issues, they talk about them. The agency has to address the major issues, certainly even some of the minor issues, not necessarily all the issues. And in this case, as Judge Hurwitz has pointed out, you actually have kind of an interesting thing here. They took your expert suggestion, they've been monitoring it. You actually have real-time review of what has occurred. It isn't just projection, it's real-time. And it raises a very interesting issue. There's obviously no such thing as mootness in a NEPA claim, but in this sense, I wonder how this gets treated. If the agency says it complied with NEPA, but it has this ongoing reporting, there's been nothing that has raised alarm, doesn't that, in effect, render moot the NEPA portion of the claim, because all the disclosure allegedly occurred before, but in any event, you've got this ongoing thing, there's been no problem. Doesn't that solve the NEPA portion of this? Not according to this Court's case law, I don't believe so, Your Honor. Very recently, in Northern Plains v. Surface Transportation Board,  there was a question about the baseline data that was collected in advance of the permitting. And there, there was a reliance on the collection and monitoring that would occur as part of a mitigation effort. And Your Honor said very clearly there that that reliance pre-assumes approval, because it assumes that regardless of what the effects may be, there's mitigation that will solve the problem. And that's not what NEPA requires. That's a slightly different situation, isn't it, Counsel, because there, everything was conditioned upon this condition of the permit. You didn't know what was going to happen here, on the other hand. Their argument is they have satisfied NEPA fully. But nonetheless, they decided just to be extra careful. The State's blessing as well, they put in this monitoring. So it's kind of NEPA plus from their perspective. They've given you an extra measure of deference, if you will, allowed testing. I guess what I struggle with is that NEPA has frequently been used as basically a measure to stop things from happening, which is totally appropriate when there has been inadequate disclosure as defined by this Court and the Supreme Court's case law. I'm struggling with what it is they didn't do here that didn't meet the requirements of NEPA, and then you add into it this continual testing, which was not required by NEPA, arguably, but which was done nonetheless, and there's been no problem. I think your position is we need to move back to the point when the permit was issued and see whether it was issued appropriately, right? That's right, Your Honor. Okay. So let's go back there, because I think the issue that Judge Smith and I are worrying about is not clearly addressed by our case law. Let's go back to the time that the permit was issued. What additional testing should have been done before the permit was issued? Your Honor, the DEQ memorandum suggests this additional testing to confirm the site-specific capacity to attenuate the hexavalent chromium. When you say site-specific, what sites are you talking about? The sites of the four sites that the permit would cover? Presumably, since those were the ones that were actually covered by the permit. And as I read the record, although I don't pretend to expertise here, there were some site-specific tests done by the permittee. Right. And DEQ looked at those tests. And what I find confusing is whether what the DEQ report was saying is the simple cost-effective stuff that we need to do is future monitoring some of the things that your expert recommended, or whether the DEQ expert was talking about some other test that's not disclosed anywhere in the record and nobody has yet identified for me. Right. So what do you think? Primarily, I think it was the Corps' job to figure out what these additional tests were. Well, what the Corps tells us that what these additional tests were were the monitoring, the same tests that your expert suggested. Right. I'm not sure on the statement is ambiguous, so tell me what additional tests your position is they should have done before issuing the permit. Given the DEQ statement to quantify the attenuation capacity at a particular site, that appears to be, given the factors of attenuation, to be more specific testing at each of the proposed mining sites. About the attenuation capacity. About the attenuation capacity. Of the environment, of the land and the water. Exactly. And given the posture of this case, that this is not an environmental impact statement case, this is an environmental assessment case, the identification and the raising of that potential to gather additional information triggered the requirement to do the environmental impact statement. Now, at the environmental impact statement stage, the Corps would have had the opportunity to evaluate the relative value and importance of that additional data to be gathered against its cost under the CEQ regulations and would have disclosed at that point in the environmental impact statement whether data was missing or whether there was insufficient or incomplete information. I'm sorry, I didn't mean to cut you off. Can we read the DEQ report slightly differently? Can we read the DEQ report as saying, I'm an expert and I don't think there's going to be any significant impact here, but anything is possible and if you want to be absolutely 100% sure, there are some tests you can do? Assuming that's what it says, would that trigger the necessity for an EIS? That's a good question. I don't think that's how we read the DEQ. I assume you don't, but let's assume I read it that way. The case law, I think, is clear that uncertainty must be grounded in scientific evidence and not pure speculation. In other words, if there was no scientific studies that said hexavalent chromium can form here, if there's no scientific studies that say, in fact, that it's so site-specific that you can't make a generalization from these scientific studies, you need to have site-specific data. Given that we have that here, we're not talking about pure speculation. In other words, and I think that comes from the idea as well, that even if an impact is likely to have a significant effect, in other words, a high risk such as toxic hexavalent chromium in drinking water, even if the probability may be low, there's still a duty to look at that uncertainty. Well, that's an interesting proposition. So you're suggesting that the mere mention of any possibility, even though it's heavily discounted by the very person you're talking about, triggers a study requirement. Is that right? That's not what I'm saying, Your Honor. Okay. May I help you with what you said then? What I'm saying is that in this case, the DEQ report relied on scientific studies that say this can form. They said it's very site-specific, so you need to make sure you collect adequate data at each site to see what the capacity is. And the Department of Environmental Quality memorandum doesn't heavily discount this. The language is quite hedging. It is possible that hexavalent chromium could be generated, but appears unlikely to be significant given the apparent potential to reduce. This is a hedging statement. It's not a heavily- Okay, but let's take it as it is. It's a hedging statement. And so they say, just to be sure, let's do some ongoing testing, which is exactly what was done. What I'm having trouble with here is the concept that just because there's a hedging statement made, and as a lawyer, you certainly understand how those are made. That's what we do, right? But they make this hedging statement, and the way they hedge it is, just to be sure, let's do some testing. And they do the testing, which is what your expert said as well. It seems like everything that the experts asked for were pretty much done here. You want more site-specific information. I gather that. But the DEQ was not so concerned, if the testing came along, that they raised any hackles about this. Isn't that enough to satisfy the legal requirement here? What's your answer to that? If the DEQ didn't raise its hackles about it? Well, no, that's not enough, because NEPA requires that the information be provided to the agencies and the public in advance of the decision. So it's not enough to say, oh, well, we'll figure it out later, and we'll see whether a problem comes up or not. Let me get back to the issue we talked about before. We're three years on to this now. It's supposed to be done in advance. All the other folks say they did comply, and they did it, you know, NEPA plus with the testing. How can NEPA be complied with three years after the fact, given the facts of this case? Well, if NEPA requires a review of available data, then presumably now you have a bigger body of available data to review in order to do the analysis that was required. So what would you do? You would just say, okay, stop, stop the mining, stop everything, stop the testing. We're going to go back, and we're going to take a look again at the data. Is that what you're saying? Yes, Your Honor. Okay. Let me ask you a question about a topic we haven't talked about. The National Marine Fisheries Service concluded after consultation that there wasn't likely to be an adverse effect on the fish, if you will, which requires, I take it from the briefing, a lower level of CR6 than for humans. And you have not appealed that finding, have you? No, Your Honor. We have not raised that on the field. I'm wondering whether that may be dispositive of other issues in the case. If there's not likely to be an adverse effect, to use the term loosely, on the fish, and the fish require a lower level of CR6 to affect them, and you don't dispute that, why is this a case in which there's likely to be an effect on humans? That's a good question, Your Honor. And I think that because the National Marine Fisheries Service is looking particularly at the endangered fish species, there were other factors about the location of these mines and the presence of fish that factored into the determination that this was not likely to adversely affect those populations as a whole. In your view, they're not the same issues? That's right, Your Honor. They're not the same issue in my view. I'd like to turn very briefly to the cumulative effects analysis. In this case, the environmental assessment excerpt of a record, page 266 and 267, states that additional aquatic effects are expected to occur if future applications for mining along the southwestern Oregon coast are authorized. The EA then concludes that the Corps will consider the cumulative effects of any future mining proposals in conjunction with the current proposal to determine overall significance. This Court has been very clear that an agency may not avoid a significance determination by deferring consideration of cumulative impacts to a future date when meaningful consideration can be given now. But aren't those cases in which somebody gets permission to start something and it will inevitably be that the project will involve other things? Here the Corps, I take it, could say the next time somebody comes in and wants to lease a site to do chromite mining, no, we have to go through the permitting process. We have to either issue a FONSI or do an EIS. I read those other cases as cases in which the cumulative effects will be inevitable because the next things will almost surely happen. Here the question of whether they will happen depends on whether the agency lets them do more mining. Certainly. The future effects, the future projects that need to be evaluated are not those that are inevitable, though, Your Honor. They're those that are reasonably foreseeable. And, again, this Court has recently clarified, based on EPA's own guidance and policy, that projects need not be finalized or even proposed in order to be considered reasonably foreseeable as part of that analysis. But the Section 33, the Shepherd site and the Westbrook site to which you make reference all face enormous logistical hurdles to development. Aren't we supposed to take those into account in our evaluation of this issue? The logistical hurdles to whether those are reasonably foreseeable? Let's just say that they're going to be a CR6 problem if we build Disneyland right outside the courthouse here. Not going to happen. Not going to happen. But if you did, there might be a problem. How do we treat that? Given that the agency's rationale for its decision must rise and fall on what is in the environmental assessment, given that the environmental assessment repeatedly acknowledges the future mining plans to the point where it's part of this company's business model to continue to mine in this area, this plant that was built to process this material is anticipated to continue over years to process from future mining sites. Given that the EA acknowledges that the state mining agency had already approved one of those sites, wetland deletions were done, and you had information about how much ore was expected from each of those sites. Did I break it back to our northern case? That's sufficient information to analyze at this point. But isn't your best approach there is when they do Section 33, then you come in and say, now we've got a cumulative problem here because we've got this problem and this problem, and it's a real-world issue rather than simply speculation. You don't know what's going to happen in the future with these others. But don't you think that that reads out the reasonably foreseeable future project? I guess it depends what reasonable says. If you're waiting to see until that is actually proposed and approved, then you've read out that inclusion of future projects and reasonably foreseeable projects. I see I'm out of time. Thank you for your argument, counsel. I appreciate it very much. Let's hear from the other side. May it please the Court, I'm Maggie Smith for the Federal Defendants. I would like to reserve five minutes of my time for counsel for the Intervenor Defendant Oregon Resources Company. The record in this case demonstrates that the Corps fully complied with the requirements of NEPA and the Clean Water Act. For two years, five different agencies, state and federal, analyzed the potential impacts of this project. This effort resulted in substantial redesigns of the project to address environmental concerns, independent analyses by the expert agencies, and a thorough investigation of all potential environmental. So let me ask you about the DEQ report. And the critical language in the DEQ report, from my perspective, is the report that says whatever you think it says up to that point. I don't think there's going to be a problem. It's possible, but attenuation is likely to take care of it. But there are easy, I'm not quoting, easy, cost-effective field studies that can be done to confirm my position. What are those studies? You can't tell either, can you? It seems to be very clear for me in the document that the author is referring to the specific recommendations that he then goes into great detail about in the next. Right, and the specific recommendations are for monitoring. Monitoring, including baseline monitoring, which would be ongoing to help further establish what the conditions of the site are. But it's for a monitoring regime. So your position is that when he talks about easy, I assume it's easy, cost-effective field studies, he's talking about the very monitoring that was made part of the condition of the permit? Right, to confirm the attenuation capacity. So, you know, once mining begins and there are changes to the site, that that capacity would be able to be confirmed by looking at the condition at the site. Here's my difficulty with that, and maybe I'm over-reading his report. As I read the conclusion of the DEQ expert, it's that I've read other studies that suggest that environmental factors will attenuate the possibility that CR6 will be formed in any dangerous amounts. But they're field-specific, and therefore we probably ought to do further studies in this area to make sure that the capacity of this area is the same as those in the studies that I've read. And he also looked at the monitoring, the data that had already been gathered about those sites and said based on the information that is resulting from the tests. That was collected in the permitting process up to that point. Yes, yeah, over the course of the year, that the results of those specific findings tend to confirm that this site is likely to attenuate. But in the future, if we continue to monitor the sites as mining goes on. So if I can summarize from your reading of it, you think when, and the expert said simple cost-effective studies, field studies, he was referring to the very monitoring that was ordered as part of the permit? That's correct. And I think just basic common sense would also help to confirm that, because the idea that DEQ would be aware of some simple cost-effective field studies that could protect water quality in Oregon and then fail to articulate what those are, it just seems really unlikely. It doesn't seem like the best reading of the document. The CORS reading, which was that DEQ was recommending the monitoring regime that it set forth in its recommendation section, is the better reading. Let me ask you this. Ms. Johnson raised the point that the expert talked about how site-specific these problems are. Are there sites that are important for water quality that are not being tested as part of this regimen? The DEQ author believed that the number of wells that it described in its recommendation would be sufficient to protect groundwater quality. So basically it's like a sampling regime. You've got an algorithm or something that will be sufficient statistically to provide the kind of sampling necessary to protect the public. Is that right? The experts at DEQ established what they believed was a monitoring regime that would be sufficient to protect. But it doesn't actually sample each site. It's a statistical analysis based upon the best sciences to how you test this big group. I mean, I believe that there is monitoring occurring at each of the different mine sites. Okay. But, I mean, I can't speak in great detail about what the monitoring regime is. Tell me what we do with the unusual procedural posture in this case. Normally these cases are up here with some sort of preliminary injunction or the permit hasn't been issued yet. Here we're three years into it. We don't have anything in the record about what's happened, but I'm surmising that the permit hasn't been revoked or somebody would have told us. So what do we do? This is an interesting issue that does come up in NEPA cases. I mean, it's our view that the agency's decision had to be supported by the administrative record, and the administrative record in this case doesn't contain the monitoring that occurred after the decision became final. So that's- So for our purposes we go back three years and we forget what's happened. Yeah, and it does become a bit of a, you know, a strange exercise to say the least. Can you think of any other case that involves a similar factual situation in terms of the horses out of the barn kind of thing, as far as NEPA is concerned? Where the court could take into account- In other words, where the permit's actually been issued, three years has gone by without monitoring as opposed to a case coming up to us on injunctive relief. If the permit's not yet been issued, if we issue a ruling that says there's been inadequate testing, then there's no harm, no foul because nothing's started yet. It's the procedural posture that we're struggling with right now because it seems different. Do you know of any cases like this? No, I'm sorry, Your Honor, I'm not aware of any cases that have this exact posture. Which is why parties normally pursue the injunctive relief part of the case because we hear it more quickly and we can make a decision then before much has occurred. Right. You know, that's- yes. Now, don't feel uncomfortable that you don't have an easy answer. We're having the same sort of question about it. Right. I mean, I do think that this type of monitoring is not usually part of these type of project authorizations because generally, you know, if there's monitoring, it's for different purposes. You know, that said, we believe that the agency's decision should rise and fall on the administrative record, which in this case we believe amply supports the court's conclusion that the risk of hexavalent chromium formation was not significant. So tell me what this record has in it with respect, before the permit was issued, to studies of the attenuation capacity of the four mine sites, as opposed to the general studies that the EEQ experts are doing. Right. This is the monitoring that occurred. There's a wet season monitoring event and a dry season monitoring event that are referred to in the permit. These were these- Right. And are those- This sampling occurred in 2008 from numerous wells at the different mine sites. And those results were analyzed by the DEQ. And were they analyzed to determine the attenuation capacity of the environment or were they just simply analyzed to see the CR6 level? No, the DEQ also looked at the presence of other heavy metals and the pH of the samples, both of which are important factors in determining whether or not chromium, hexavalent chromium would be mobilized and whether it would then, the site would then have the capacity to return it to its trivalent form. And the conclusion was that conditions at these sites tended to support the formation and stabilization of trivalent chromium. Is there any test that was recommended by either the plaintiff's expert or the DEQ that was not done or that was not included as part of the ongoing testing in this case? With respect to pre-mining testing, I'm not aware of anything, anything specific that was recommended. I don't believe the record contains such a test. And I think this is an important reason why the plaintiffs have not met their burden to show that the Corps acted arbitrarily and capriciously. The Corps took a good look at this. They went to the exact entity that you would want the Corps to go to for help in analyzing the risks of this problem. And all the evidence that it had in front of it said, we've done what we can before mining occurs, and it appears very unlikely that this is going to be a problem. Given that, I think the Corps was entitled to rely on those findings and that its conclusion that the risk was not significant was not arbitrary and capricious. Can you address the cumulative impact issue? Yes, absolutely. And this Court said in Northern Plains Resource Council that the question should be whether there is enough information to permit meaningful consideration of cumulative impacts. Here, the EA explains all of the difficulties in forecasting what is going to happen with this chromite mining in the future. As the plaintiffs pointed out, this is a very new venture. It's a new type of mining. It's not clear how well things are going to go or whether or not ORC is going to be a successful business venture. That's one source of uncertainty. The second is the problems that are specific to the sites themselves. Those that have proved chromite resources had major access problems. Indeed, Section 33 and Shepard were originally envisioned by the company to be a part of its initial mining plan, and they had to withdraw those from consideration because the logistical hurdles became too great, and the company made a decision that it was not going to be able to go forward on those absent some sort of major change to the regulatory regime. So your view is that these are not reasonably probable events? That's right. I mean, there's so much uncertainty about whether they would go forward, how large of scale they would be if they were to go forward, and when they would go forward that looking at them in a cumulative impact analysis would not provide meaningful information for assessing the project. And furthermore, in the alternatives analysis, the Corps did look at what the likely impacts would be from going forward with these projects and determined that they would result in greater impacts to aquatic resources than the four sites or specifically the North Sun and Devil site that ORC had put forward as part of its initial proposal. So the environmental, the potential environmental impact from these sites was considered in the alternatives analysis as well, and the Corps found that they would in fact be greater than the four sites. Something else that I just wanted to touch on was the plaintiff's reliance on Blue Mountain for the idea that the EA has to, can't, cannot, you know, incorporate by reference or needs to be able to have perhaps even more information than one would expect from an EIS. We just want to make clear that an EA is supposed to be a short, concise statement, and it is perfectly reasonable for an EA to not reproduce the record at length, provided that, you know, for example, specifically with respect to the hexavalent chromium discussion, that that discussion is listed, is, you know, the information that the Corps relied on is explained in the EA, and its conclusion is clearly made, which in this case it certainly was. And if there are, are there any further questions? Then I'm happy to. Maybe you'll have a co-counsel come and speak to us here. May it please the Court, Harold Ramchur on behalf of Oregon Resources Corporation. I'd like to just really start addressing briefly the DEQ report and how we think that report should be read. First of all, I think it's very important to note that the report not only talked about the types of testing, but it involved a very detailed consideration of not only scientific literature about how this type of chemical was formed generally, but site-specific data, which is cited and attached at some length at SER 111 and following, about borings and examination of groundwater from the specific location. The existing monitoring well data showed safe levels of hexavalent chromium. It showed the presence of chemicals that would contribute to this type of reducing effect on hexavalent chromium. That was an interesting factor from my perspective, that the testing seemed to show that it was the opposite of an attenuation. It was actually the chemicals there, at least on what was tested, seemed to show that it was going the opposite direction. That's correct. And there also was sample testing showing that there were other types of chemicals in the environment that would contribute to that reducing effect. So that was another comfort factor that DEQ had in making this recommendation. So address the language, though, that we've been focusing on here. Sure. As I read it, it's at least subject to a reasonable interpretation of what the expert is saying is, well, we need to do a little bit more. I'm pretty sure, but we need to do a little bit more, and then I would be certain. Why shouldn't we read it that way? I would say you shouldn't read it that way because put in context, it wouldn't make any sense. And if you look at the entire report at page 111 and 112, there's a long list of the existing tests that have been done. Then there's a discussion also of the fact that ORCA conducted leaching tests, in other words, to see will this material leach chromium, and it included that that wasn't going to take place. The report at the bottom of 112 suggests, well, no, that might not happen in the environment, so you should do some site-specific groundwater monitoring to do that. And then you have a conclusion section on page 113. Which only mentions monitoring in terms of groundwater. The conclusion section talks about the cost-effective studies, but it is in a sentence that is almost right before the specific recommendations that DEQ lists. DEQ has a list of five recommendations right below the section where the cost-effective studies are mentioned. It is completely unreasonable to suggest that these cost-effective studies up here are not the ones that are referred to immediately following. And these are the cost-effective studies that were, in fact, incorporated into the permit and that have been done. So from your perspective, the language there that everybody understood exactly what was going to be done, that the experts signed off on it, the DEQ signed off on it, and basically that was, under current technology, that was the best that could be done. Is that it, your perspective? That is precisely right. And moreover, that monitoring was completely reasonable, given the other factors which suggested that this wasn't going to be a problem. This is not a case in which DEQ only relied on monitoring. DEQ had a lot of information suggesting this wasn't going to be a problem, and then, as Your Honor put it, added a plus factor. Let's put in the monitoring to make sure that it won't be a problem going forward. And from our perspective, we think that while this is a procedurally odd posture, that the fact that this hasn't come up, that it hasn't been an issue, is something that the Court can take into account in its decision, because the record shows that would it were it to become a problem, it would have been taken into account, and it hasn't been. Can we really do that? Let's assume that the permit was issued inappropriately, no studies at all, but you've been doing studies since and there hasn't been a problem. Can we really say, well, what the heck, it wouldn't have been a problem? Well, if you can say at the time of the permit, it included a condition that you would have to cease mining if it were an issue. But don't we have to find that the FONSI was appropriately issued? I'll withdraw that point. I'll withdraw that point. I wish we could do that. Frankly, you know, we would have entered a suggestion of mootness on the issue, but for the fact that there were other arguments that were supporting their NEPA claims, and so we didn't do that. Well, our case law answers Judge Hurwitz's question in the negative. You can't do that. You've got to find, you've got to comply with NEPA. You've got to comply with NEPA, period. The question here is, did that happen, and what role, if any, did the monitoring play in terms of showing the thoroughness of it? I don't think there's really an issue of whether we can, and Northern Plains and other things dealt with that. A lot of other cases do, too. You can't just say, you know, we're not sure what's going to happen. We're not going to comply with NEPA now, but we're going to do some tests in the future. You can't do that. Our case law is clear about that. So, but here you have the issue of whether all these tests that are listed in 111, 112, and the conclusion in 113, lots of scientists, DEQ, that's no easy agency for anybody trying to get anything done. They did a lot of tests. The plaintiffs' expert did a lot of tests. Arguably, they're saying that's the best that can be done, and to top it off, they added a force majeure clause, which is we're going to have some ongoing tests, just to be sure. Not necessarily to verify, but just to be sure that in the future there isn't a change. So I gather that the position that you have and your co-counsel is NEPA was fully complied with here. The test wasn't absolutely required, but just to be safe, just to add an extra little element, that's what they did. Is that correct? I think that is correct, Your Honor, and I think that the other data, the technical memorandum, and the other things that were referred to in the EA fully support that conclusion, as well as the DEQ study itself. Thank you. Very good. We thank you both for your fine arguments. It helps us a lot in our deliberations. The case that's argued is submitted.
judges: Alarcon, Smith, Hurwitz